Mr. Justice Cox
delivered the opinion of the court.
' I am requested to announce the conclusions of the court in the case of Browne vs. Sanders and others.
This case has been before the court a long time, and has given us a great deal of trouble, in consequence of the difficulty of understanding the operations of some of these building associations.
The complainant, in his bill, avers that in 1852, an unincorporated association was organized, called the Territorial Savings, Boan and Building Association of the District of Columbia. Complainant further says that he became the owner of ten shares of the stock of this association of Series No. 4, as of the date of November 12, 1872, and afterwards became the owner of thirty-three shares of Series No. 6, dated May 9, 1873, making in all forty-three shares. He says that he went regularly to work to pay up his dues as required by the constitution and by-laws of the association, and had paid in about the sum of $2,800 on these shares of stock. He calls attention to article 10 of the constitution of the association, which is worded as follows:
‘ ‘Any stockholder who shall not have received an advance may withdraw his stock from this association by giving one month’s written notice to the Board of Directors. For the purpose of ascertaining the amount due on withdrawal, the Board of Directors shall, once in three months, report the *462 value of each share of stock as shown by the assets and liabilities of the association. Bids shall then be received for a voluntary surrender of stock at a lower price, sufficient to absorb the funds on hand. If a sufficient number of shares for this purpose shall not be offered, then the funds on hand shall be applied as follows: First, members having given notice of withdrawal, as provided in this section, shall receive in the order of such notice, the value of their stock ascertained as above.”
In pursuance of this article of the constitution, the plaintiff says that on the 6th day of November, 1877, he gave a month’s notice of the withdrawal of ten shares of Series No. 4, and thereupon became entitled to a return of the dues he had paid on these shares with 10 per cent, interest, unless it appeared that the association had sustained losses, which he says was not the case. On December 15, 1883, six years afterwards, he gave notice of the withdrawal of all the remaining shares; that is, of the thirty-five shares in Series No. 6, and his demand was refused upon the ground or pretext, he says, that the association had sustained losses, and had not made profits.
What he complains about on the part of the association may perhaps be better explained by a slight digression from the record. It appears that one Seth Terry was secretary of this association, but not the treasurer, and that a large number of shareholders had paid their dues to him, for convenience, trusting him to pay them into the treasury. About the beginning of 1880, it was discovered that instead of paying that money into the treasury, he had appropriated about $25,000 of these dues, and advances returned on loans, to his own use. The complaint is, that the association treated that money, which went into the hands of Terry, as if it had been paid to the treasurer, and gave these several shareholders credit for it, as if it had gone into the treasury, and afterwards treated the defalcation as a loss sustained by the association, the burden of which was to be borne by the shareholders rateably.
*463 The plaintiff denies that it was a loss of the association, and claims that it was a loss of the individual shareholders’ who had seen fit to trust their money to Terry, without seeing that it passed from him into the hand of the treasurer, and he complains that this loss should not be charged, in part even, against those shareholders whose money had been paid into the treasury, and who, therefore, had a right to claim this return with io per cent, interest. He further complains that settlements have been made with withdrawing shareholders whose money had thus come into Terry’s hands, in which credit was given to them for this money as having been paid into the treasury, and payments were made to them accordingly, by which means, as he says, the money properly due to him and others situated like him, was diverted to those who were not entitled to it.
It is not necessary, at this point, to say anything more about the answer than to say that it maintains the position that this was the loss of the association, and that it was properly chargeable as such, and therefore there were not profits made, and the complainant was not entitled to the return of his dues with io per cent, interest as claimed. It denies, therefore, any misappropriation of the funds of the association.
This case was referred to the auditor and testimony taken before him, and exceptions taken to his report. The complainant obtained a decree at the special term, and the case came here and was argued, once or twice, I think. We were not satisfied with the aspect of the case, and desired further information, and had it again referred to the auditor. It now comes up on the last report of the auditor.
These associations are essentially partnerships, but they differ from the ordinary mercantile partnerships in several respects. For example, no one partner has the right to bind the members of the firm, as in an ordinary case of partnership. The conduct of the business of the firm is entrusted to a select body of directors. Again, any one member of this partnership may transfer his interest to an entire stranger, and intro *464 duce him into the concern, without the consent of his co-partners.
The capital of this concern is contributed by small periodical payments by each of the members, instead of being contributed from the beginning, and unlike other copartnerships it is not employed in dealing with outsiders, but in controlling the money of the copartners among themselves. Another important feature is, that here any one partner may withdraw from the concern and withdraw all the capital which he has put into it, with his proportion of earnings created upon that capital. That is provided for in this article io of the constitution, which I have read. It gives him the right to withdraw all of his shares and to receive back all his dues paid in, with io per cent, interest per annum, on equated time, on those dues.
Of course, this partnership is based upon a very close calculation of the profits and earnings of the association. It is all upon the assumption that no losses have been incurred, and that the several members have regularly paid their dues, and that they have been made productive, according to the scheme of these associations. In case losses have been incurred, as, for example, if the treasurer becomes a defaulter and the funds disappear, or if the shareholders fail to pay up their dues, and the securities given by them cannot be realized upon, or they are incurred in any other way, then the privilege of receiving io per cent, per annum is modified by these circumstances, and therefore the constitution expressly provides that this privilege is conditional upon the fact that profits have been earned and no losses incurred.
Now, just here, I digress again to say, that this case is the sequel of another case which was instituted some years before it. Seth Terry’s defalcation was discovered in the beginning of 1880. How long it had been going on I do not know, and the evidence does not disclose it. He was indicted for having embezzled the funds of this association. I believe I was presiding in the criminal court at the time, and inasmuch as it appeared that this money had simply been paid into his hands by the shareholders, and it did not appear that it had *465 ever reached the treasurer of the association, and it also appeared that he was not the treasurer, we held in the criminal court that the embezzlement was not of the property of the association, but if it was the embezzlement of the property of any one, it was of the property of those who had entrusted him with this money, and therefore he was acquitted.
This position seems to have suggested the idea to some one, and probably to the complainant, that it was not proper to charge the defalcation as a loss of the association, and immediately after that, suit was instituted against the officers of the association in the name of Mrs. Morrow, who had two shares in this association, and who had paid in $168 in dues, to have her dues repaid to her with io per cent, interest. Mrs. Morrow was a servant in the family of this complainant, and the suit was instituted in her name, with Mr. .Ridout as her counsel. This complainant, who was a member of the board of directors of the association, was one of the defendants.
There was almost no investigation of the facts on the first hearing of that case. Mrs. Morrow’s complaint simply was, that the officers of this association assumed to treat this money which was misappropriated and converted to Terry’s own use, as a loss of the association, and they proposed to charge the loss to the association, and deduct it from the assets of the association, so that the distributive shares of’ the members would thereby be reduced, including her own; whereas she maintained that this was not a loss by the association, but a loss of the individual members who had paid their dues to the wrong'person, who had no authority to receive them, and that the dues ought to be considered as not having been paid in by these members, and not as a loss by the association of some part of their assets, but should be charged against the members by whom they were payable, and that they were not to be charged as a loss against the shares of the complainant, in the assets of the concern.
The answer in that case really amounted to a demurrer. It did not aver any new facts, but simply averred that Terry was an officer of the association and a partner therein. It *466 was alleged that the complainant and all other shareholders were equally bound to contribute to any losses sustained by the partnership, by reason of this defalcation; that the money paid by the members was paid by them to an officer of the association, and a partner therein, and in so far as the money was paid to him in that capacity, they paid it to the association. So, the only question- raised there upon the pleadings was, whether the payment of this money to Terry was a payment to the association because he was a partner in the association and an officer of it, although it did not appear that he was the proper person to receive the money. That was the distinct question presented to the court. That abstract question was decided in favor of the complainant; that is to say, we held that the payment to any officer of the association or to any member, as a partner, was not a payment to the association which would charge it and discharge the party paying it.
There were two features in that case which it is important to notice, and which differ from the present case. In the first place, it did not appear in that case that anybody but Mrs. Morrow herself was interested in that question, or that to allow her claim in full would interfere with the equities of anyone else claiming, or who might have equal equities with her. Her claim was trifling, and it was perhaps not very vigorously contested. At all events, to pay her in full would not have had. an appreciable influence upon the claims of the other members of the association who might be in a situation like hers and entitled to the same relief. In the next place, all the members of the association were before the court either by name or representation. The officers were made parties, and a number of the members, not all of them, because they were too numerous, were made defendants, as the representatives of the whole association. If these defendants had simply paid the money to Terrjr'-, and not paid it into the treasury of the association, as she claimed, then they still owed their monthly dues, and these were still assets of the association. The members were before the court, and it was within the power of the court to compel them by decree to pay up their *467 arrears in the discharge of the obligations of the association, and to protect the rights of persons having claims on this fund.
When the Morrow case came up the second time before the court, the testimony did not go any further than to prove for the defense that the secretary was authorized to receive these payments, because he was provided with a book with blank receipts to give to the shareholders, for their monthly dues, and the practice was that he should give them receipts, and enter the payments in detail in his book, and afterwards pay them over into the hands of the treasurer. But the constitution required that these payments should be made at stated monthly meetings, on Fridays. The court held that this was an essential part of the requirement, because the payments being made to the secretary in the presence of the treasurer, this was a guarantee of the safe transmission of these funds through him to the treasurer, the shareholders paying the money to him in the presence of the treasurer and seeing that he paid it over; and that payments to him elsewhere, or at any other time, than at these stated meetings were not authorized by the constitution. It was like the case of a customer of a bank handing his money to the cashier at his own dwelling, and trusting to him to deposit it in the bank, instead of depositing it there himself. That was the conclusion reached upon the second hearing of the Morrow case.
Now we come to the present case, and we find that in paragraph 7 of the bill it is charged that this complainant and Mrs. Morrow and some others, who have since withdrawn, were the only members of the association who had paid their money into the treasury, and that all of the defendants, some forty in number, were among those who had paid their money to the secretary,-which had not been by him turned over to the treasurer, and that therefore the complainant stands in an entirely different relation to the association than these defendants.
It was the apprehension, when the case was before us, that there might be other parties having equal equities with the *468 complainant, and situated just as lie was, which led to the last reference to the auditor, and the auditor was, in part, to inquire whether there were not other parties whose equities were equal with his, and whose equities might be interfered with .if he was given his entire claim in priority over them.
So far as we can gather from the evidence and the last report of the auditor, it does appear that this averment of the bill is a mistake, and that these defendants have paid large amounts of money which went regularly to the treasury as dues.
Terry’s defalcation amounted to about $25,000, and it appears that $3,000 of that amount was from returns of advances.
The constitution does not, in terms, require these advances to be paid at any particular time or place, but simply that one dollar in money shall be paid by each stockholder in addition to their monthly dues. The practice of the association was a warrant for the return of these advances at any time and place, because it was practically impossible for them to be paid at the stated meetings. As a matter of fact, they never were, but were paid to the treasurer at other times, and did not come within the ruling in the present case.
That left about $22,000 as the amount of the defalcation which consisted of monthly dues paid by the members. It appears from the evidence that nearly $20,000 of the money paid by these defendants can be traced directly through the books of the secretary to the treasurer, and into the latter’s possession; so that these defendants, certainly to that extent, have paid their dues into the treasury, and have come within the very language of the tenth paragraph of the constitution, which gives them the right to withdraw their dues and receive interest at ten per cent, per annum on equated time, which is exactly the right the complainant claims here.
But there is no money, and nothing to pay all these parties with. So far, it would appear that these defendants had the same equities the complainant has. His claim cannot be paid without reducing theirs, and therefore it would be a manifest injustice for his claim to be paid in full, and given priority *469 over the others. It does not make any difference, so far as we can see, that he has given notice of withdrawal, and they have not, because each of them had the same right to give a notice of withdrawal, and on that notice to receive his funds back again. But, as I have already mentioned, that would be impossible if the complainant’s claim were paid in full.
There is another very important circumstance in this case which is deserving of consideration. Since the Morrow case was begun, two-thirds of the members of the association have withdrawn, and out of 137 members, the membership is now reduced to 40. They have been settled with, have retired and are not before the court. If the complainant were entitled to his claim in full, it would not be contributed to in part by the unpaid dues of those various members who did not now pay their dues into the treasury and that burden ought to fall upon them rateably. Under the present circumstances the burden, which ought to be in part discharged by these two-thirds of the members who have withdrawn, would fall entirely upon those who remain. That, again, seems to be entirely inequitable.
There is only one ground upon which the complainant could maintain that there is no such equity upon the part of the defendants, and that is, by showing that these defendants are responsible for this condition of things; that is to say, that they are responsible for having settled with these retiring 'members in the manner already mentioned and for not having collected the unpaid'dues, etc.
Can that proposition be maintained under the facts in this case?
It must be remembered that the complainant here was a co-partner with these defendants and wherever he did not dissent from their action, and wherever he took no antagonistic position, the action of the partnership is as much his action as theirs. He is just as much responsible for what was done as any other member of the partnership so long as he remained in it. The evidence, so far as we can see, not only indicates no dissent on the part of the complainant, but indi* *470 cates that he was co-operating with them from the commencement of this difficulty and the discovery of Terry's defalcation, down to the time this suit was instituted.
The complainant was one of the directors of this association, one of the active managers, and was repeatedly elected a member of the board of directors.'
As far back as February 17, 1880, there was a special meeting of the board of directors held. There was a full attendance at this meeting and the complainant was present. There a motion was passed declaring, in terms: “That this association haying sustained losses from the defalcation of its late secretary, that in future settlement of advances, no interest shall be allowed on stock cancelled in such settlements.”
That was a clear recognition by this partnership that the defalcation of Terry was a loss of the association.
Then, on the 9th of April, 1880, in view of this defalcation of Terry, an amendment was adopted to the constitution. The 10th clause of the constitution was amended so that instead of members being entitled to withdraw their money with interest at 10 per cent., the provision was this: “Any stockholder who shall not have received an advance may withdraw his stock from this association by giving one month’s written notice to the board of directors. For the purpose of ascertaining tlje amount due on withdrawal, the board of directors shall, at a regular meeting once in three months, report the value of each share of stock as shown by the assets and liabilities of the association. Bids shall then be received for voluntary surrender of stock at a lower price sufficient to absorb the funds on hand. If a sufficient number of shares for this purpose shall not be offered, then the funds remaining on hand shall be applied as follows: First. Members having given notice of withdrawal as provided in this section, shall receive in the order of-such notice the value of their stock ascertained as above.”
That is to say, whenever the funds were on hand, any member who desired that his stock should be redeemed might *471 bid such an amount as he was willing to receive for its redemption and whoever bid the lowest sum and was willing to redeem at the lowest figure, would take the money on hand.
At that time, there was a report made by a committee which had previously been appointed to confer with the i)istrict Attorney in regard to the prosecution of Terry, which committee consisted of Mr. Bayne, this complainant, and some one else. At this meeting, there was a report made by Mr. Bayne, I presume as chairman of that committee, as to the present condition of the association, its assets and liabilities, and it was then reported that the assets were about $29,000, and the liabilities $58,000; that is to say, the assets were about 50 per cent, of the liabilities. The complainant was present at the meeting and participated in the proceedings. That report was based upon the assumption that Terry’s defalcation was the loss of the association and had reduced its assets to'about 50 per cent, of its liabilities. By these liabilities, I suppose, was meant the amount which it was bound to pay to withdrawing members; that is to say, to the stockholders, as stock is always a debt of the association to stockholders.
There was no dissent at all at this meeting, on the part of the complainant who was present, when the loss of Terry was so considered to be the loss of the association.
Then, on the 12th of August, 1881, there was another report made on the same basis showing the assets to be then about 40 per cent, of the liabilities, such calculation being based on the sanie assumption that Terry’s defalcation was a loss of the association. The complainant was the presiding officer at that meeting.
On the nth of November, 1881, there was still another amendment offered, which provided that, instead of redeeming stock in the manner I have already mentioned, if there were assets on hand, they should -be distributed among the stockholders. “If, in the judgment of the Board of Directors, it was considered best for the interest of the association and all concerned, it shall have the right and power to dis *472 tribute any moneys or other assets at the real value of the net assets in the hands of the treasurer, pro rata, amongst the stockholders, according to their several interests, instead of disposing of the same bjr sale, as hereinbefore provided, in this section.”
I am not sure, but I think the complainant was present at this meeting. At all events, that was acted upon afterwards, and he was certainly present at several meetings at which Stock was redeemed in the manner I have already mentioned, the value of the stock itself being calculated in the manner I have explained and upon the assumption that Terry’s defalcation was the loss of the association.
On the 8th of February, 1884, which is the month before this bill was filed, the complainant was present, and, on his motion a vote was cast for the new directors and the old officers were re-elected, including himself. At that meeting, there was a report made by the secretary estimating the value of the stock. I should say further, that at several meetings there were reports showing dividends distributed among the stockholders. Here was a report, at a meeting at which he was present, directing future dividends by the association at the rate of 30 per cent, on $28,092, making $8,405.90 — making about 42 per cent, of all the assets upon the remaining stock, including former dividends.
The Morrow case was first decided by the court on the 10th of December, 1883, and on the 15th of that month, 5 days afterwards, notice was given by the complainant of the withdrawal of his remaining thirty-five shares of stock, but he continued to be apparently a member, and was re-elected a director of the association even after that.
On the 21st of February, for the first time, as it appears, he called attention to the decision of the court in the Morrow case, and objected to any further payments being made, on the ground that they would be in contempt .of the decree of the court. Up to this time, it appears that the complainant not only did not dissent from any action of other members of the association, but concurred in them, and that all of these settlements made with retiring members and all this redemp *473 tion of stock at its depreciated valuation and all this distribution of dividends, took place, apparently, with his concurrence. So that the action of the association in this respect was as much his action as that of his copartners.
This is not, properly speaking, a case of estoppel, as in case a man is dealing with a third person who is a stranger. This was the joint action of the complainant and his copartners themselves, and that being the case, it is impossible for him to charge upon them the responsibility for the condition of the assets at the time this suit-was instituted, when he withdrew from the association.
On February 21, 1884, he withdrew from the association, and nothing further is shown with reference to his connection with it. Being a copartner, then, he was just as much responsible to the other shareholders as they were to him for the condition of affairs which made it impossible to pay him in full without reducing the shares of the others,, who seem to have equal equities with him.
When he withdrew from the association, then, we may conceive he assumed the position of a creditor, and he had a right to claim from them his proportion of the assets then on hand, they becoming personally responsible for them.
What we hold is, that the assets on hand at the time of his withdrawal from the association were distributable pro rata between the parties who had paid money into the treasury, including the complainant and those defendants who appear to have done so.
The loss of a part of the assets since, by the defendants, by depositing the money in Middleton’s bank, is their own loss, and is not chargeable to this complainant. He is in no way responsible for that.
I presume there will have to be another reference in this case, simply as a matter of calculation, to show what amount was paid into the treasury by each one of these defendants, and then the dividends would be rateable upon those amounts and the amounts claimed by the complainant. Teave will have to be given in this case for another reference, or the bill will have to be dismissed without prejudice.
*474 The question of costs is a serious one in this case and will be considered hereafter.
This is the best we can do with the case as it presents itself at this time.